PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DR. FRANK RAGOZZINE, | ) | |
| | ) | CASE NO. 4:13cv750 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| YOUNGSTOWN STATE UNIVERSITY, *et al*., | ) | |
| | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| Defendants. | ) | **ORDER** [Regarding ECF No. 53] |

Pending before the Court is the Motion for Summary Judgment filed by Defendants Youngstown State University ("YSU"), Cynthia Anderson and Karen Giorgetti (collectively "Defendants"). ECF No. 53. Plaintiff Frank Ragozzine responded, ECF No. 55, and Defendants replied, ECF No. 58. Defendants also filed a Joint Proposed Stipulation of Facts, ECF No. 52.

The Court has been advised, having reviewed the record, the parties' briefs, the applicable law and, at the request of Ragozzine, heard oral argument on February 4, 2014. For the reasons explained below, the Court grants Defendants' motion.

## I. Background

### A. Undisputed Facts Regarding Ragozzine's Tenure Bid

Ragozzine was hired by YSU as a tenure track Assistant Professor of Psychology on August 21, 2006. ECF No. 11 at 2, ¶7. Prior to joining YSU, Ragozzine was an Associate Professor with tenure at Missouri State University. *Id*. He gave up both tenure and the rank of

(4:13cv750)

Associate Professor to accept the lower ranked position at YSU. *Id.*

At YSU, Ragozzine was on a five-year tenure track program, and was scheduled to apply for tenure in the fall of 2011. *Id*. at 3, ¶22. In August 2011 Ragozzine requested a postponement of tenure review for one year. *Id*. at ¶21. He requested the postponement because his mother's and wife's "severe health problems during the preceding year had substantially interfered with his ability to get his scholarly work written and submitted for publication, jeopardizing his chances of obtaining a positive tenure decision in 2011." ECF No. 52 at 4, ¶36. YSU's Provost approved Ragozzine's request, and, accordingly, Ragozzine applied for tenure one year later, in the fall of 2012. *Id*. at 2, ¶2.

At YSU, tenured faculty in a tenure candidate's relevant department: (1) review the tenure candidate's tenure application; (2) view the candidate's presentation; (3) then vote for or against tenure *via* secret ballot. ECF No. 11 at 3, ¶23; 49-5 at 25. In the instant case, eight tenured faculty in the Psychology Department officially voted on Raggozine's tenure—four voted in favor and four voted against.[1] ECF No.11 at 4, ¶24. During the vote, one additional tenured faculty member whom was then on sabbatical, Jeffrey Coldren, also voted against Ragozzine's tenure. ECF No. 52 at 2-3, ¶¶10, 13. Coldren had reviewed Ragozzine's personnel files in-person on campus prior to the vote and had observed Ragozzine's tenure presentation *via* Skype.[2] *Id*. at 2, ¶11; at 4, ¶29.

Pursuant to the Collective Bargaining Agreement ("CBA"), after the tenured faculty

---

[1] All eight professors are identified by an identifying number, not by name.

[2] Skype is an online service that permits individuals to see and hear one another.

2

(4:13cv750)

votes the Psychology Department Chair makes a recommendation to award or deny tenure to the Dean of the College of Liberal Arts and Social Sciences. *Id*. at 2, ¶3; at 3, ¶16; ECF No. 49-5 at 25. The Psychology Department Chair, Karen Giorgetti, recommended to Dean Shearle Furnish that Ragozzine be denied tenure. ECF No. 52 at 3, ¶14. When Chair Giorgetti provided her recommendation to Dean Furnish, she reported the four-four vote and that, although Coldren was not permitted to officially vote, he voted against tenure. *Id*. at ¶15. Giorgetti further explained that she noted Coldren's vote to indicate a majority faculty decision. *Id*.

Dean Furnish concurred with Giorgetti's recommendation to deny tenure and forwarded this recommendation to the Provost, per the CBA. *Id*. at ¶16. The Provost, Ikram Khawaja, concurred with both Giorgetti's and Furnish's recommendations and, per the CBA, transmitted his recommendation to deny tenure along with those of Giorgetti and Furnish and the department faculty vote to YSU's President, Cynthia Anderson. *Id*. at ¶17. President Anderson denied tenure to Ragozzine after reviewing the recommendations of the Chair, Dean, and Provost. *Id*. at ¶18.

Ragozzine appealed the tenure denial. *Id*. at ¶20. The Tenure Denial Review Committee ("TDRC"), comprised of non-Psychology Department faculty, unanimously found that Ragozzine's tenure denial was wrongfully made. *Id*. at ¶¶21, 22. Thereafter, President Anderson, on March 5, 2013, notified Ragozzine that, after reviewing the TDRC's report, she had decided to affirm the recommendation of the Chair, Dean, and Provost to deny him tenure. *Id*. at ¶23. Anderson's decision denying tenure to Ragozzine was final and binding on all parties. *Id*. at ¶24.

3

(4:13cv750)

### B.  The Tenure Review Process

A brief description of the guidelines governing YSU's tenure review process is in order.

Ragozzine's tenure review process was governed by the CBA, the Psychology Department

Governance Document ("Governance Document"), and the codicil to Ragozzine's letter of

appointment.  *Id*. at 2, ¶6.  In the event of a conflict between the CBA and the Governance

Document, the CBA prevails.  *Id*. at ¶8.

Tenure candidates are evaluated in three categories: scholarship, teaching and service.

ECF No. 53 at 10; 55 at 12; 49-5 at 25.  According to the CBA, the tenure review process

involves a "review of the candidate's past contributions and an evaluation of the candidate's

promise of satisfactory future contributions to the University" and is "based on the departmental

statement of normally expected activities and expectations for progress toward promotion and

tenure."  ECF No. 49-5 at 25.  The Governance Document states that the process "will follow the

process and procedures listed in section 10a.3" of the CBA and reiterates the above quoted

"promise of satisfactory future contributions" language from the CBA.  ECF No. 49-6 at 9.  The

Governance Document also provides that the process will adhere to the codicil language, which

in general states,

> Departmental expectations for receiving tenure include *consistent evidence of*
> *quality performance* during the probationary period in the areas of scholarship,
> teaching, and service.  Specifically, the candidate must demonstrate a coherent
> and active scholarly agenda as evidenced by two or more published articles in
> refereed journals or equivalent production, effective teaching, and demonstrated
> commitment to University and Community service.

ECF No. 49-6 at 9 (italics in original); *see also* ECF No. 49-7 at 1 (Ragozzine's codicil).

Certain tenured faculty members, Chair Giorgetti, and Dean Furnish whom voted or

4

(4:13cv750)

recommended against tenure voiced concerns about Ragozzine's scholarship.  Specifically, the

reviewer's noted that, although Ragozzine had published two peer-reviewed articles, he did not

do so until during 2011-2012—the extra year he was granted by the Provost for tenure

postponement.  The reviewers noted that the timing of Ragozzine's published works, in addition

to their quality, indicated to the reviewers that Ragozzine's research lacked consistency and the

promise of future contributions.  *See* ECF Nos. 49-45 at 2 (Chair Giorgetti's tenure

recommendation); 49-46 (Dean Furnish's tenure recommendation); 51-58, 59, 60 (faculty notes

on tenure denial).[3]

### C.  Ragozzine's Claims

Ragozzine filed the instant lawsuit on April 4, 2013 alleging three claims against

Defendants.  Count 1 is a claim for sex discrimination in violation of Title VII, 42 U.S.C. §

2000e *et seq*. against YSU, in which Ragozzine alleges that he was discriminated against on the

basis of his male gender.  ECF No. 11 at 6, ¶49.  Ragozzine contends that a female comparator,

Julie Boron, went through the tenure review process at the same time he did and was granted

tenure.  *Id*. at ¶48.  He alleges that YSU "failed and refused to grant [him] the same terms and

conditions of employment" as it did Boron.  *Id*.

Count 2 is a 42 U.S.C. §1983 claim against Psychology Department Chair Giorgetti and

YSU President Anderson for a violation of Ragozzine's Fourteenth Amendment rights.  *Id*. at 7,

¶58.  Ragozzine alleges that Giorgetti's "solicitation and consideration of the opinion of a faculty

---

[3] Ragozzine received his most favorable reviews as teacher.  *See, e.g.*, ECF Nos. 46 at
19; 49-46.

(4:13cv750)

member who was not eligible to vote" denied Ragozzine both due process and equal protection. *Id*. at ¶56.  Ragozzine also alleges that President Anderson's conduct amounted to a constitutional violation because Anderson "failed to exercise her supervisory authority over [] Giorgetti and failed to act in accordance with the lawful procedures available to Plaintiff to prevent a violation of 42 U.S.C. § 1983." *Id*. at ¶57.

Count 3 is a claim alleging a violation of the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, *et seq*. against YSU.  *Id*. at 8.  Ragozzine alleges that he "took intermittent FMLA leave and worked a reduced schedule so that he could care for his mother and spouse." *Id*. at ¶64.  He states that, because of the family illnesses, "he sought and was granted an additional year within which to apply for tenure and to obtain the acceptance of scholarly articles for publication required for tenure." *Id*.  He alleges YSU held him to "a higher standard regarding requirements to gain tenure," subjecting him to an adverse job action in retaliation for his taking leave and violating his rights under the FMLA.  *Id*. at ¶¶65-66.  Specifically, Ragozzine alleges that Chair Giorgetti criticized the timing and delay of his publications despite Ragozzine's assertion that he was, at that time, on intermittent FMLA leave.  *Id*. at ¶64.

## II.  Legal Standard

Summary judgment is appropriately granted when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005).  The moving party is not required to file affidavits or other similar materials negating a claim on which its opponent bears the

6

(4:13cv750)

burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial." *Guarino v. Brookfield Twp. Trustees*, 980 F.2d 399, 403 (6th Cir. 1992).

Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. An opposing party may not simply rely on its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). The non-moving party must, to defeat the motion, "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." *Guarino*, 980 F.2d at 403. In reviewing a motion for summary judgment, the court must view the evidence in the light most favorable to the non-moving party when deciding whether a genuine issue of material fact exists. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

The United States Supreme Court, in deciding *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986), stated that in order for a motion for summary judgment to be granted, there must be no genuine issue of material fact. *Id.* at 248. A fact is "material" only if its resolution will affect the outcome of the lawsuit. In determining whether a factual issue is "genuine," the court must decide whether the evidence is such that reasonable jurors could find that the non-moving party is entitled to a verdict. *Id.* Summary judgment "will not lie . . . if the evidence is such that a

7

(4:13cv750)

reasonable jury could return a verdict for the nonmoving party." *Id.* To withstand summary

judgment, the non-movant must show sufficient evidence to create a genuine issue of material

fact. *Klepper v. First Am. Bank*, 916 F.2d 337, 342 (6th Cir. 1990). The existence of a mere

scintilla of evidence in support of the non-moving party's position ordinarily is not sufficient to

defeat a motion for summary judgment. *Id.*

### III. Analysis

To limit redundancy and confusion, Ragozzine's claims are discussed in reverse order.

### A. The FMLA, 29 U.S.C. § 2601, *et seq.* Claim Against YSU

#### 1. The Nature of the FMLA Claim

The parties disagree whether Ragozzine alleged a FMLA retaliation claim or a FMLA

interference claim in the First Amended Complaint. YSU's motion advances arguments

supporting their position that Ragozzine cannot prove FMLA retaliation in violation of 29 U.S.C.

§ 2615(a)(2). ECF No. 53 at 29. Ragozzine, in opposition, contends that he alleged a FMLA

interference claim—that YSU violated 29 C.F.R. § 825.220(c), which "interprets the FMLA's

interference provision to 'prohibit[] an employer from discriminating or retaliating against an

employee . . . for having exercised or attempted to exercise FMLA rights." ECF No. 55 at 18

(emphasis in original). Ragozzine argues that YSU did not properly move for summary

judgment on his FMLA interference claim and that Ragozzine is therefore entitled to "a jury trial

on that issue." *Id.* n.3. YSU, in reply, asserts that it reasonably believed Ragozzine was alleging

a FMLA retaliation claim; that Ragozzine impermissibly advances new FMLA interference

arguments for the first time in his opposition brief; and that, regardless, the same legal standard

8

(4:13cv750)

and factual arguments apply to both types of claims, and that their arguments raised in their motion brief may be applied to an interference FMLA claim. ECF No. 58 at 7-8.

The Court finds that the balance of the allegations in the First Amended Complaint, specifically in Count 3, are ambiguous enough to encompass both a retaliation claim and an interference claim. *See* ECF No. 11 at 8-9 (identifying Count 3 as a "retaliation" claim and repeatedly using the word retaliation, while also citing 29 C.F.R. § 825.220(c)). *See also Welty v. Honda of Am. Mfg., Inc.*, 411 F.Supp.2d 824, 829 (S.D.Ohio 2005) (noting the "often-confusing scope of what constitutes interference" and citing other cases discussing "the current, confusing state of FMLA law" while attempting to "reconcile the problematic use of applying the labels interference, discrimination, and retaliation to FMLA claims" (internal citations and quotation marks omitted)). Accordingly, the Court finds that YSU did not waive moving for summary judgment on the FMLA interference claim, and that Ragozzine does not impermissibly advance interference arguments in his opposition brief. Because Ragozzine states in his opposition brief that his allegations may also be viewed as a FMLA retaliation claim and analyzed under that theory, ECF No. 55 at 20, the Court considers Ragozzine's FMLA claim under both theories.

### 2. The Interference Claim

29 U.S.C. § 2615(a)(1) provides that "[i]t shall be unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided under th[e] [FMLA]." To prevail on an interference claim, a plaintiff must establish that,

> (1) he is an "[e]ligible employee," 29 U.S.C. § 2611(2); (2) the defendant is an "[e]mployer," 29 U.S.C. § 2611(4); (3) the employee was entitled to leave under

9

(4:13cv750)

>the FMLA, 29 U.S.C. § 2612(a)(1); (4) the employee gave the employer notice of
>his intention to take leave, 29 U.S.C. § 2612(e)(1); and (5) the employer denied
>the employee FMLA benefits to which he was entitled.

*Wysong v. Dow Chemical Co.*, 503 F.3d 441, 447 (6th Cir. 2007) (quoting *Cavin v. Honda of*

*Am. Mfg., Inc.*, 346 F.3d 713, 719 (6th Cir. 2003) (overruled on other grounds)).  Ragozzine is

asserting a "negative factor" claim, *see* ECF No. 55 at 19, in which case the fifth element can be

established by showing that YSU used Ragozzine's leave against him in an unlawful manner.

*See Wysong*, 346 F.3d at 447.

### a.  The Timeline of Ragozzine's Publications

Ragozzine argues that his request for a one-year postponement of tenure review "due to

the time off he took to care for his relatives" was used as a negative factor by YSU when YSU

denied him tenure.  ECF No. 55 at 24.

Ragozzine's relevant time at YSU can be summed up as follows.  He began teaching at

YSU in the fall of 2006.  *Id*. at 10.  He contends that he was unable to work on scholarly matters

until his "lab" was up and running, which occurred "into his second year," in 2007/2008.  *Id*.

The Court credits the lack of laboratory facilities as justification for Ragozzine not publishing a

peer-reviewed article or engaging in research in his first academic year (2006/2007).  It remained,

however, that Ragozzine still did not have a peer-reviewed article published during his second

(2007/2008), third (2008/2009), fourth (2009/2010), or fifth (2010/2011) academic year.  ECF

No. 49 at 157.  Ragozzine's wife became ill in the summer of 2010, before his fifth academic

year.  *See* ECF No. 49-29.  He requested postponement of tenure review a year later, in August

2011, shortly before he was scheduled to apply for tenure.  ECF No. 49-29 at 1.  His first peer-

10

(4:13cv750)

review article was published at the end of 2011.  ECF No. 49 at 157.  His other two peer-reviewed articles were subsequently published in 2012 and 2013.  Id. at 112-113.  Although there is some dispute as to whether one article is a qualifying article, at the time he applied for tenure, in the fall of 2012, Ragozzine had objectively satisfied the tenure requirement of having produced two peer-reviewed publications.  ECF Nos. 55 at 9; 53 at 21.

The recommendations and faculty votes against Ragozzine's tenure referenced the quality and timing of Ragozzine's scholarship, described above, and expressed a general belief that Ragozzine did not work on meeting his scholarship requirements until his tenure review loomed large.  *See* ECF Nos. 51-58 ("it seems that [Ragozzine] may have assumed that tenure was automatic . . . . It is only when it became apparent that this was not the case did his publication efforts kick into high gear."); 51-60 ("[Ragozzine's] scholarship has been long in coming, and seems to have reached its current level only as a last-minute flurry of activity in the year extension he received of his probationary period."); 49-45 at 2 (noting that Ragozzine, prior to his 2011 publication, had no relevant scholarship publications since 2002); *see also* ECF No. 40 at 94 (Giorgetti testifying that, regarding Ragozzine meeting his two-article quota, "[i]t took him over six years to do it.").  Ragozzine argues that these comments reflect "YSU's perception that Ragozzine fell short in the category of scholarship because his publications came in 'the eleventh hour' (*i.e.* late in his probationary period)."  ECF No. 55 at 25.  He contends that, because he was taking FMLA leave during his sixth year, YSU used the extra year he was taking leave as a negative factor in its decision to deny him tenure.  *Id.*

It is undisputed that Ragozzine was an eligible employee and YSU an eligible employer.

11

(4:13cv750)

Also undisputed is that Ragozzine was entitled to leave to care for his wife and mother, both

suffering from serious health conditions.  The question is whether Ragozzine gave YSU notice of

his intention to take FMLA leave.  *See Wysong*, 503 F.3d at 447.

### b. The FMLA Notice Requirement

To invoke FMLA's provision, an employee must request leave and give the employer

notice.  *See Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004).  "An

employee does not have to expressly assert his right to take leave as a right under the FMLA."

*Hammon v. DHL Airways, Inc.*, 165 F.3d 441, 450 (6th Cir. 1999).  "Once an employer is given

notice that an employee is requesting leave . . . the employer bears the obligation to collect any

additional information necessary to make the leave comply with the requirements of the FMLA."

*Id*.  However, "nothing in the [FMLA] places a duty on an employer to affirmatively grant leave

without such a request or notice by the employee."  *Brohm v. JH Properties, Inc.*, 149 F.3d 517,

523 (6th Cir. 1998),

"[T]he critical test for substantively-sufficient notice is whether the information that the

employee conveyed to the employer was reasonably adequate to apprise the employer of the

employee's request to take leave for a serious health condition that rendered him unable to

perform his job."  *Brenneman*, 366 F.3d at 421.  "An employee needs to both request leave and

when foreseeable, state the amount needed."  *Id.*

YSU contends that Ragozzine failed to give notice because he neither requested leave nor

did he ever take leave.  ECF No. 58 at 9-11.  Ragozzine identifies two ways in which he provided

notice—(1) a conversation Ragozzine had with Chair Giorgetti "[i]n the 2010/11 academic year"

12

(4:13cv750)

about his wife's serious health condition; and (2) the August 2, 2011 letter Ragozzine sent to the

Provost requesting a one-year extension within which to file his application for tenure.  ECF No.

55 at 21-22.

### i. Ragozzine's Conversation with Chair Giorgetti

Ragozzine alleges that he had a conversation with Chair Giorgetti sometime during the

2010/2011 academic year about his wife's serious health condition.[4]  Id. at 22.  He contends that

this conversation satisfied the FMLA's notice requirement, "because Giorgetti was his immediate

superior."  Id.

YSU rejoins that the mere fact that Giorgetti knew Ragozzine's wife was ill "does not

lead to the conclusion that YSU was on notice . . . that [Ragozzine] was seeking intermittent

leave under the FMLA."  ECF No. 58 at 9.  YSU also provides:

> The only relief Ragozzine requested from YSU involved spending more, not less
> time at work—*i.e.*, an extra year to complete research.  He never requested leave
> from work.  Ragozzine, who claims to have read the CBA closely, chose to
> exercise his right under Section 10.6 to gain an extra year to apply for tenure—a
> benefit promptly granted to him by YSU—and not his rights under Section 7.4.1
> to use FMLA leave or under Section 7.2.1 to take sick leave for a family medical
> matter.

ECF No. 58 at 10-11 (internal citations to the record omitted).  When deposed, Ragozzine

testified that, during the 2010/2011 academic year: he had never notified his immediate

supervisor (Giorgetti) that he would be taking sick leave to care for a family member or that the

---

[4] During his deposition, Ragozzine testified that prior to sending the August 2, 2011
letter, he had informed "the department secretary who would routinely ask me how my wife and
mother were doing."  ECF No. 49 at 93.  He testified that Giorgetti "was present during some of
those conversations.  At one point she called me in her office and said— her words were,
[']what's the deal with your wife.[']  I explained it to her."  Id. at 93-94.

(4:13cv750)

problems necessitated taking leave (ECF No. 49 at 93-94, 97, 111-112); that although he

sometimes took paid leaving during the year, he did not know whether Giorgetti or anyone in the

human resource department knew he was taking it (*id*. at 92-93); and that he never took any

unpaid leave (*id*. at 92).

Moreover, Kevin Reynolds, Chief Human Resources Officer in the YSU Office of

Human Resources, swore that,

> [a]s a member of the Ohio Education Association, Dr. Ragozzine was entitled to
> 15 days of paid sick leave each year during the 2010-11, 2011-12, and 2012-13
> academic years. As of July 27, 2011, Dr. Ragozzine had accumulated 583.15
> hours of paid sick leave. Human Resources records indicate that Dr. Ragozzine
> did not use any paid sick leave until the spring of 2013.

ECF No. 53-2 at 2, ¶9.

Beyond telling Chair Giorgetti about his wife's medical condition, Ragozzine does not

provide any evidence that he did anything else to indicate that he needed leave, was requesting

leave, or that he even took leave. Instead, the record reveals that Ragozzine did not request

leave; he did not indicate that he needed time off to care for his wife; he did not take time off to

care for his wife. In short, Ragozzine does not establish that he gave Giorgetti information

reasonably adequate to apprise her of a request to take leave to address a serious health condition

that rendered Ragozzine unable to perform his job. *See Brenneman*, 366 F.3d at 421. Binding

legal authority does not allow for the proposition that an employer's awareness, alone, of a

family health problem is tantamount to an employee's request for FMLA leave or that such

awareness triggers an obligation on the part of the employer to provide FMLA leave information.

14

(4:13cv750)

Ragozzine has not provided legal authority that indicates otherwise.[5]

### ii. Ragozzine's Letter to the Provost

Ragozzine also contends that he sought intermittent FMLA leave in his August 2, 2011 letter to the Provost requesting a one-year postponement of tenure review, per the CBA. ECF No. 55 at 22. YSU accurately points out that the letter is written entirely in the past tense, *i.e.*, discusses past family health problems, that caused Ragozzine to request the extra year to accomplish his tenure requirements and not that he was seeking prospective FMLA leave. ECF No. 53 at 31.

Ragozzine's August 2, 2011 letter states, in part:

---

[5] Although Ragozzine cites a number of cases in his brief, the facts in those cases include something more than an employer's mere knowledge of medical problems, alone. *See, e.g., Perry v. Jaguar of Troy*, 353 F.3d 510, 512 (6th Cir. 2003) (notice requirement met when employer knew employee's son was disabled; employee told supervisor he needed time off work to care for his son; and employee filled out a company leave form); *Barrett v. Detroit Heading, LLC*, 311 Fed. App'x 779, 791-2 (6th Cir. 2009) (notice requirement met when employer knew employee had severe and disabling hypertension; employee's doctor signed numerous slips excusing employee from work for extended periods of time; and on the day employee was fired for being absent, his wife and his doctor had communicated to employer the need for a day off due to employee's urgent hypertension issue and his wife did request the day off); *Wiseman v. Awreys Bakeries, LLC*, 528 Fed. App'x 428, 429, 431-32 (6th Cir. 2013) (issue of fact as to whether employee gave proper FMLA notice when he told employer he "was injured" and "could not work" because of a back injury he sustained at work, after having had time off due to an initial back injury; in addition employee filled out an injury report form at work and asked to visit the company health clinic); *Bradley v. Mary Rutan Hosp. Assoc.*, 322 F. Supp. 2d 926, 944-45 (S.D.Ohio 2004) (issue of fact as to whether plaintiff gave notice when she "called off" work numerous times because her husband was ill and indicated to her employer that she may need to become part-time to care for her husband); *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 717, 725 (6th Cir. 2003) (notice sufficient when employee informed employer he was injured in a motorcycle accident and unable to work and then requested leave); *O'Hara v. Mt. Vernon Bd. of Educ.*, 16 F.Supp.2d 868, 873, 890 (S.D.Ohio 1998) (notice sufficient when plaintiff filled out forms requesting maternity leave and correspondence "repeatedly referred to the FMLA").

(4:13cv750)

> I am writing to request a postponement of my tenure review, due to the severe health problems of two of my family members over the past year.  These unforeseen problems have substantially interfered with my ability to get my scholarly work written and submitted for publication, thus jeopardizing my chances of obtaining a positive tenure decision this year.

ECF No. 49-29 at 1.  The letter goes on to describe the illnesses of Ragozzine's wife and mother

"[i]n the past year."  *Id.*  The letter continues,

> As a result of these problems, I have spent countless hours over the past year in hospital rooms and doctor's offices, and in caring for my wife and my mother.  *If I had known that these problems were going to occur, I would have requested a leave of absence so that I could take care of my family*, but these events were unexpected.  Nevertheless, despite these problems, I was still able to meet my teaching and committee-work obligations, and only missed one day of classes during spring semester.  However, I simply did not have time to do things such as analyze my data, write scholarly manuscripts, and submit my work for publication.  As a result, I have not yet obtained a first-author peer-reviewed publication since arriving at YSU. . . . Therefore, I suspect I would be unsuccessful if I applied for tenure this year.

*Id.*  (emphasis added).  The provost granted Ragozzine's request for an extra year to apply for

tenure.

Although Ragozzine now asserts that he "was seeking leave to care for his wife and

mother," the letter does not support this view.  ECF No. 55 at 12.  The letter recites past events

and requests a one-year postponement of tenure review, indicative of Ragozzine's inclination to

spend the time working to meet his tenure goals knowing that he would "be unsuccessful" if he

applied for tenure in 2011.  By all accounts Ragozzine did, in fact, spend the extra year meeting

his tenure goals— not taking time away from YSU to care for family.[6]  Ragozzine does not

---

[6]  Ragozzine does not advance the argument that the letter retroactively requests FMLA leave for the preceding academic year, nor would such an argument be tenable.  *See* 29 C.F.R. § 825.303(a) ("Timing of notice.  When the approximate timing of the need for leave is not

16

(4:13cv750)

dispute that he did not publish any peer-reviewed articles during his time at YSU until the end of

2011.  ECF No. 49 at 157.  All of his publications while at YSU were produced during his one-

year extension, the time during which Ragozzine now argues that he was taking intermittent

FMLA leave.  *See* ECF No. 55 at 22.

   Ragozzine posits, in his brief, that Dean Furnish "had also seen the August 2nd letter, and

knew that Ragozzine was seeking leave to care for his wife and mother."  ECF No. 55 at 11-12

(citing Furnish's deposition, ECF No. 46 at 23-24).  Ragozzine's assertion is simply not

supported by the record.  While being questioned by Ragozzine's counsel, Dean Furnish's

deposition went as follows:

> Q:  Did you discuss the contents of [the August 2, 2011] letter with the provost?
> A:  Not in detail.
> Q:  Did he mention it to you?
> A:  Oh, yes. He wanted to know what my position was.
> Q:  And what was your position?
> A:  My position was that I was not against postponement.
> Q:  Did you talk about whether or not he should be given leave?
> A:  No, just stopping the clock.
> Q:  When you decided to stop the clock, did you consider whether or not it would change his tenure requirements?
> A:  No, because it should not change the tenure requirements.  They simply are what they are.  It did occur to me that we may have changed his case from unlikely to possible.
> Q:  Unlikely what?
> A:  Unlikely to achieve tenure.
> Q:  And is there a form for that?
> A:  No.
> Q:  What about you made that change?
> A:  That change?  Oh, you mean the decision on stopping the clock?

---

foreseeable, an employee must provide notice to the employer as soon as practicable . . ."); *see also* ECF No. 49 at 91 (Ragozzine's deposition wherein he testified that he was able to schedule some of his wife's medical appointments).

(4:13cv750)

> Q:  No.  If I wanted to know what his ranking was, unlikely or possible?
> A:  No, there is no form for that.
> Q:  As you understood it, why was Dr. Ragozzine seeking leave?
> A.  For the health of his wife and mother.

ECF No. 46 at 22-24.  Dean Furnish did not testify that Ragozzine was prospectively seeking time off to care for his wife and mother.  Rather, Furnish understood Ragozzine's request for tenure postponement was because of the health concerns of Ragozzine's wife and mother.  The August 2011 letter explains Ragozzine's reasons for postponement.  Ragozzine has not shown that the August 2, 2011 letter to the Provost is evidence of an intent or attempt by Ragozzine to request FMLA leave.[7]

Ragozzine also contends that "YSU cannot establish it properly disseminated its FMLA policy."  ECF No. 55 at 23.  He claims "YSU has not satisfied its burden under 29 C.F.R. 825.300(a)(3) that this policy was included in 'employee handbooks or other written guidance to employees,' or was distributed in any other way to Ragozzine."  ECF No. 55 at 23.  This argument fails—the CBA clearly provides an explanation of FMLA benefits.  *See* 49-5 at 19.

**2.  The Retaliation Claim**

To prove a FMLA retaliation claim, a plaintiff must establish (1) he was engaged in protected activity; (2) the employer knew he was exercising FMLA rights; (3) he suffered an adverse employment action; and (4) the protected FMLA activity caused the adverse action.  *Seeger v. Cincinnati Bell Telephone Co.*, 681 F.3d 274, 283 (6th Cir. 2012).  In the absence of

---

[7]  Ragozzine argues that his conversation with Giorgetti combined with Giorgetti's knowledge of the August 2, 2011 letter to the Provost is adequate notice to Giorgetti of his attempt to take FMLA leave.  ECF No. 55 at 22.  This argument is unavailing because neither the conversation nor the letter evince Ragozzine's attempt to take intermittent FMLA leave.

18

(4:13cv750)

direct evidence to establish a *prima facie* case of discrimination, the framework set forth in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973) applies. *Id*. If a plaintiff establishes a

*prima facie* case, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory

reason for its action. *Id*. at 284; *McDonnell Douglas Corp*., 411 U.S. at 802. When a defendant

succeeds in doing so, the final burden shifts to the plaintiff to prove that the defendant's stated

reason is false, and that unlawful discrimination was the real reason. *Seeger*, 681 F.3d at 285.

Ragozzine submits that he "has 'direct' evidence of retaliatory motive, in the form of

Giorgetti's statements." ECF No. 55 at 20. Ragozzine does not identify those statements. The

Court notes that Ragozzine, throughout his brief, does not identify statements made by Giorgetti

that are direct evidence of a retaliatory motive against Ragozzine for taking FMLA leave. For

example, in order to consider Giorgetti's comments that it took Ragozzine six years to meet the

tenure requirements as evidence of discrimination requires an inference that Giorgetti was

referring to Ragozzine's care of his family and not his inconsistency in scholarship, which is well

documented. *See Daugherty v. Sajar Plastics, Inc*., 544 F.3d 696, 708 (6th Cir. 2008) ("general,

vague, or ambiguous comments do not constitute direct evidence of discrimination because such

remarks require a factfinder to draw further inferences to support a finding of discriminatory

animus.").

Although it appears that Ragozzine may have been eligible to take FMLA leave, there is

no indication that he did so.[8] Rather, as discussed above, Ragozzine did not engage in protected

---

[8] Ragozzine seeks an expansion of the law. The Court is not aware of binding case law that holds different standards should apply to work produced by an employee when he has family health issues that would have justified FMLA leave or that has a retroactive effect.

(4:13cv750)

activity.  He did not provide notice to YSU.  Accordingly, he is unable to establish a *prima facie* case under either FMLA theory of recovery.  *See Wysong*, 346 F.3d at 447; *Seeger*, 681 F.3d at 283.  The Court grants summary judgment in favor of YSU on the FMLA claim.

### B.  The Title VII, 42 U.S.C. § 2000e *et seq.* Claim Against YSU

Title VII of the Civil Rights Act of 1964 prohibits discrimination on the basis of race, color, religion, sex, and national origin in the terms and conditions of employment.  42 U.S.C. § 2000e-2(a)(1).  To succeed on a Title VII claim, a plaintiff must either produce direct or circumstantial evidence of discrimination.  *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004). Ragozzine does not argue he has evidence of direct discrimination, so he must prove a *prima facie* case by establishing, by a preponderance of the evidence, that: (1) he was a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) that others, similar to him in all respects other than membership in the class at issue, did not suffer the same adverse action.  *See McDonnell Douglas Corp.*, 411 U.S. at 802; *Grizzell v. City of Columbus Div. of Police*, 461 F.3d 711, 719 (6th Cir. 2006).  In a "reverse discrimination" case, *e.g.*, a man alleging sex discrimination, a plaintiff must also show "background circumstances to support the suspicion that the defendant is that unusual employer who discriminates against the majority."  *Id*. (quotation marks and citation omitted).

If a plaintiff establishes a *prima facie case*, the burden shifts to the defendant to articulate a legitimate, nondiscriminatory reason for its action.  *Id*.; *McDonnell Douglas Corp.*, 411 U.S. at 802.  When a defendant succeeds in doing so, the final burden shifts to the plaintiff to prove that the defendant's stated reason is false, and that unlawful sex discrimination was the real reason.

20

(4:13cv750)

*Harris v. Metro Gov't of Nashville & Davidson Co.*, 594 F.3d 476, 486 (6th Cir. 2010).

### 1. *Prima Facie* Case

The parties disagree as to whether Ragozzine has to show background circumstances that YSU is the unusual employer that discriminates against men.  *See* ECF No. 53 at 17; 55 at 21. Despite Ragozzine's argument to the contrary, the Sixth Circuit requires a plaintiff alleging a reverse gender discrimination claim to establish background circumstances that the defendant is the "unusual employer" that discriminates against the majority in order to state a *prima facie* case.  *See Zambetti v. Cuyahoga Community College*, 314 F.3d 249, 256-57 (6th Cir. 2002); *Gielda v. Bangor Twp. Schools*, 505 Fed. App'x 550, 555 (6th Cir. 2012) (table).  To show background circumstances, a plaintiff must show evidence of the defendants' unlawful consideration of gender as a factor in hiring or promotion in the past that "justifies a suspicion that incidents of capricious discrimination against [men] because of their [gender] may be likely."  *Zambetti*, 314 F.3d at 256.

The parties also disagree about what background facts are sufficient to meet the requirement.  In *Zambetti*, a reverse discrimination case based on race, the Sixth Circuit found that a Caucasian plaintiff alleged facts sufficient to create a genuine issue of fact on background circumstances because the person in charge of hiring was African-American.  314 F.3d at 257. Ragozzine argues that because the person in charge of the ultimate tenure decision was female, he has alleged sufficient background facts.  ECF No. 55 at 31.  YSU contends that the Sixth Circuit has not applied the *Zambetti* holding, applicable to race reverse discrimination cases, to reverse gender discrimination cases, and the mere fact that a female ultimately denied Ragozzine

(4:13cv750)

tenure is insufficient evidence of background facts.  ECF No. 58 at 14.

The Court need not address this issue because, assuming *arguendo* that Ragozzine has

established a *prima facie* case, he has not shown that, pursuant to the *McDonnell Douglas*

framework, YSU's stated legitimate, nondiscriminatory reason is false, and that unlawful sex

discrimination was the real reason he was denied tenure.

### 2. *McDonnell Douglas* Framework

### a. YSU's Legitimate, Nondiscriminatory Reason

YSU advances a legitimate, nondiscriminatory reason for denying Ragozzine

tenure—"during his probationary period, he did not prove 'consistent evidence of quality

performance and promise' in scholarship."  ECF No. 53 at 20.  YSU asserts that consistent

evidence of quality performance and promise is the measure used to consider whether to award

or deny tenure, and identifies this language in the CBA, Governance Document, and codicil.

ECF Nos. 58 at 16;49-5 at 25 (CBA); 49-6 at 9 (Governance Document); 49-7 at 1 (codicil); *see*

*also* ECF No. 40 at 38 (Giorgetti testified that "the single most important factor [in tenure

consideration] comes down to the CBA, which is showing future promise.").

YSU provides ample evidence that individuals whom were part of the tenure review

process consistently stated that they found the quality of Ragozzine's scholarship lacking and the

timing suspect—as a result, they did not believe he showed promise of future productivity.  ECF

No. 53  at 21-22; *see also*  ECF Nos. 41 at 8 (Professor 1's deposition in which she testified that

she was concerned about the names, numbers and dates of Ragozzine's publications); 43 at 14,

37 (Professor 3's deposition in which he testified he was concerned about the "timing" and

(4:13cv750)

"nature" of Ragozzine's publications, and that "the pattern of his publications suggested to me that his promise for future productivity was not sufficient to be awarded tenure"); ECF No. 47 at 15-16 (Professor 7's deposition in which he testified that he considered Ragozzine's potential based on what he had done while at YSU; 51-59 at 1 (Professor 7's highly critical comments regarding the substance of Ragozzine's scholarship).

> YSU also provides Professor 3's comments regarding Ragozzine's tenure application:
>
> First, his scholarship has been long in coming, and seems to have reached its current level only as a last-minute flurry of activity in the year extension he received of his probationary period.  He claims in his tenure application that he has four publications that should be considered.  However, one is in a student publication with a student he worked with in his capacity as a professor at Missouri State before coming to YSU; the second is a pedagogically oriented paper; the third is in a publication none of the department has heard of, and which, in fact, seems to be an Indian university's "home" journal; finally the fourth is scheduled for publication in 2013, but 1/3 of the work (one of three experiments) is actually his doctoral dissertation work from some two decades ago.  This despite being one of the few faculty members (maybe the first?) to receive substantial funds for equipment ($11,000 +) with which he set up his laboratory in 2007, five years ago.

ECF Nos. 51-60; 43 at 31.[9]  Professor 3, while department chair, recommended to Ragozzine in his 2008/2009 chairperson evaluation that Ragozzine's "emphasis in the coming two years should be in the area of publishing and/or grant work to strengthen your tenure application."[10]

---

[9]  Only Professor 6 wrote favorable comments about Ragozzine's scholarship.  *See* ECF No. 51-4.  There is no evidence in the record explaining why Professor 4 voted in favor of Ragozzine or why Professor 5 voted against Ragozzine.  Professor 2 voted in favor of Ragozzine, but did not elaborate on scholarship, only testifying that Ragozzine "did everything the governing document said he should do."  ECF No. 42 at 8.

[10]  Professor 3 was the Psychology Department Chair until 2010, when Giorgetti became Chair.  ECF No. 52 at 4, ¶34.

23

(4:13cv750)

ECF No. 51-39 at 1.  Professor 3 also "strongly suggested" to Ragozzine that Ragozzine

participate in pre-tenure review, "so he would not be blindsided if he did not get a tenure

recommendation.  Let me add, it would have given him time, potentially, to correct any

weaknesses that the tenured faculty saw."  Id. at 2; ECF Nos. 43 at 24.[11]

In Chair Giorgetti's recommendation against tenure, she was also critical of the substance

of Ragozzine's publications in addition to their timing.  ECF No. 49-45 at 2.  She wrote that the

"concerns which are based upon Dr. Ragozzine's level of scholarship activity indicate that his

past performance in the area of scholarship is deficient and his promise for future satisfactory

scholarly endeavors is negligible."  ECF No. 49-45 at 2.

Dean Furnish also recommended against tenure, calling Ragozzine's case "complicated"

and observing that "[t]he most intense scrutiny in Dr. Ragozzine's case regards the record of

scholarship. . ."  ECF No. 49-46.  President Anderson testified that she concluded that

Ragozzine's consistency was lacking when she made her decision to deny tenure.  ECF No. 48 at

18-19.  She testified that she considered the TDRC's recommendation that Ragozzine be

awarded tenure, but ultimately decided to side with the department recommendation to deny

Ragozzine tenure because the TDRC represented "a group of individuals who are not in Dr.

Ragozzine's department.  They don't know his work or the expectations within that department

---

[11]  Ragozzine did not participate in pre-tenure review.  ECF No. 49 at 66.  In his affidavit
he states that was unable to participate "because of the time I devoted to caring for immediate
family members."  ECF No. 54-1 at 2, ¶9.  The Court notes that Ragozzine's family members
became ill during the 2010/2011 academic year and he does not explain how these events
prevented him from participating in pre-tenure review in 2009/2010.  Regardless, Ragozzine's
lack of participation in the pre-tenure review is not material.

(4:13cv750)

or his collegiality within that department." *Id.* at 24.  In short, YSU asserts that "[a]ll of the YSU

officials involved in the decision making chain gave valid reasons for recommending or deciding

against tenure for Ragozzine unrelated to his gender." ECF No. 58 at 17.  This assertion is

supported by the record, and is a legitimate, nondiscriminatory reason for YSU to deny

Ragozzine tenure.

### b. Ragozzine's Pretext Arguments

To rebut YSU's legitimate nondiscriminatory reasons as pretextual, Ragozzine must

demonstrate that: (1) YSU's stated reason for not awarding tenure has no basis in fact, (2) the

reason offered was not the actual reason for denying tenure, or (3) the reason offered was

insufficient to explain YSU's action. *Harris*, 594 F.3d at 486.  "A defendant's proffered reason

cannot be proved to be a pretext unless it is shown both that the reason was false, and that

discrimination [or retaliation] was the real reason." *Id.* (internal quotation marks and citation

omitted).  Ragozine advances two arguments why YSU's reason is pretextual—(1) President

Anderson ignored the findings of the TDRC, and (2) "there is a factual issue as to whether YSU

stresses teaching or scholarship." ECF No. 55 at 32-33.

Ragozzine fails to demonstrate that YSU's reason for denying him tenure has no basis in

fact.  Nor does he show that the reason offered was insufficient or not the actual reason. *See*

*Harris*, 594 F.3d at 486.  He first submits that YSU "ignored the findings of the TDRC" because

President Anderson rejected the TDRC's recommendation. ECF No. 55 at 32.  The fact that

Anderson chose not to concur with the findings of the TDRC does not mean she "ignored" those

findings.  Rather, Anderson testified that she "looked at [the TDRC's findings] as yet another

25

(4:13cv750)

recommendation[.]"  ECF No. 48 at 24.

        Ragozzine misconstrues President Anderson's testimony about her reason for not following the TDRC's recommendation.  Anderson testified that the TCRC is "a group of individuals who are not in Dr. Ragozzine's department.  They don't know his work or the expectations within that department or his collegiality within that department."  ECF No. 48 at 24.  Referring to Anderson's statement, Ragozzine argues that Anderson "raised her objection to the makeup of the TDRC in hindsight.  However, the CBA [] expressly excludes members from the tenure applicant's academic department [from sitting on the TDRC]"  ECF No. 55 at 32. Ragozzine concludes that "[t]here is no clearer evidence of record that Anderson's articulated statement is pretext."  Id.  The Court disagrees.  President Anderson's testimony cannot reasonably be read as objecting to the composition of the TDRC.  Instead, Anderson merely articulated a fact—the TDRC is not made up of members of the Psychology Department. Anderson's statement—that the TDRC "do[esn't] know [Ragozzine's] work or the expectations within the department"—is also factual, and explained why she decided to credit the non-binding recommendation of the Department Chair and Dean over the non-binding recommendation of the TDRC.

        Finally, Ragozzine contends that "there is a factual issue as to whether YSU stresses teaching or scholarship."  Id. at 33.  He argues that "YSU now takes a contrary position with respect to the order of importance and the weight to be given to the three tenure criteria," scholarship, teaching and service.  Id.  It is Ragozzine's contention that scholarship is not the most significant criteria for determining tenure, but that teaching, which Ragozzine excels in,

(4:13cv750)

is.[12]  As evidence, Ragozzine identifies the codicil given to him when he was hired in May 2006, which states that tenure is based on consistent evidence of quality performance, including publication of two peer reviewed articles.  *Id*.  He indicates that the relevant section of the CBA sets forth the "objective requirements of two publications, which Ragozzine met, and requests it be used to gage [sic] future performance—a highly subjective prediction which is incapable of proof."  *Id*.  Ragozzine also offers the "Introductory Guidelines for New Faculty (Department of Psychology)" which he alleges was given to him by the department chair when he was hired.  *Id*.  He argues that the Introductory Guidelines for New Faculty "place the greatest emphasis on teaching" which "creates a material issue of fact which must be decided by a jury."  *Id*.

The parties stipulated to the following: "[a]t all relevant times during his employment at YSU, the terms and conditions of Dr. Ragozzine's employment were governed by a []CBA []"; "[t]he rules governing Dr. Ragozzine's tenure application were contained in the 2011-2014 CBA [], the psychology department governance document, and the codicil to his letter of appointment"; "[t]he tenure procedure that was in effect at YSU in the fall of 2012 is set forth in Article 10 of the CBA"; and "[i]f any part of the Psychology Department Governance Document conflicted with the CBA, the CBA would prevail."  ECF No. 52 at 2, ¶¶5-8.  *See also* ECF No. 40 at 38 (Chair Giorgetti's deposition wherein she testified that "the single most important factor comes down to the CBA, which is showing future performance.").

Ragozzine, citing a memo addressed to new faculty dated 2006, asserts that "teaching is

---

[12]  This posture contradicts Ragozzine's belief expressed in his August 2011 letter to the Provost that his failure to publish would likely result in an unsuccessful tenure application.  *See* ECF No. 49-29 at 1.

(4:13cv750)

given the greatest amount of emphasis when faculty performance is evaluated." ECF No. 55 at 13 (citing the "Introductory Guidelines for New Faculty," ECF No. 54-2 at 2). Ragozzine does not provide evidence, or even argue, that this document is a governing document. Moreover, the document warns, "[r]eading this overview should NOT take the place of reading the entire CBA and departmental governance document . . . . If any discrepancies are found between this document and the CBA, assume that the CBA will prevail." ECF No. 54-2 at 1. The Court also notes that the sentence focused on by Ragozzine does not appear in the section that describes tenure, but under a general section called "Departmental Issues" as the first item, "Responsibilities of Faculty." ECF No. 54-2 at 2.

Ragozzine's disagreement with the tenure requirements evinced in the CBA, the Governance Document, and the codicil to his employment letter, is not evidence that creates a genuine issue of material fact. The Introductory Guidelines for New Faculty memo is not evidence that creates a genuine issue of material fact. *See Guarino*, 980 F.2d at 403 (the non-moving party must "show that there is doubt as to the material facts and that the record, taken as a whole, does not lead to a judgment for the movant."). Thus, Ragozzine has failed to present evidence that YSU's legitimate reason for denying him tenure was pretextual. His Title VII claim, therefore, fails as a matter of law, and the Court grants YSU summary judgment on the Title VII claim.

### C. The 42 U.S.C. § 1983 Claim Against Chair Giorgetti and President Anderson

Ragozzine alleges that his procedural due process rights were violated because he was not afforded "a fair tenure review process." ECF No. 55 at 34. He also argues an equal protection

28

(4:13cv750)

violation based on the reasons expressed in his Title VII claim.  ECF No. 55 at 33-34.  Because

Ragozzine's Title VII claim is without merit, his section 1983 claim for an equal protection

violation is also without merit.  *See* Sutherland v. Michigan Dept. of Treasury, 344 F.3d 603, 614

(6th Cir. 2003) (courts apply the *McDonnell Douglas* framework in Title VII cases to equal

protection claims brought pursuant to section 1983).  Ragozzine's due process claim is discussed

below.

### 1.  Procedural Due Process

To succeed on a claim under 42 U.S.C. § 1983, a plaintiff must prove a defendant acted

under color of state law and deprived the plaintiff of a right secured under federal law.  *Handy-*

*Clay v. City of Memphis*, 695 F.3d 531 (6th Cir. 2012).  Procedural due process prevents arbitrary

exercises of government authority without the opportunity to be heard.  *Cleveland Bd. of Educ. v.*

*Loudermill*, 470 U.S. 532, 542-543 (1985).  Some form of due process, in the form of a prior

hearing, is required when there is a protected property or liberty interest.  *Board of Regents of*

*State Colleges v. Roth*, 408 U.S. 564, 569-570 (1972).  The Sixth Circuit has held that a

university tenure applicant "has some minimal property interest in a fair tenure review process."

*Webb v. Kentucky State Univ.*, 468 Fed. App'x 515, 521 (6th Cir. Mar. 14, 2012) (quoting

*Purisch v. Tenn. Technological Univ.*, 76 F.3d 1414, 1423 (6th Cir. 1996)).  A university cannot

deny tenure without "some degree of impartial inquiry" into his qualifications.  *Id.* (quoting

*Purisch*, 76 F.3d at 1423).  The issue is not whether university officials "conformed to [the]

official [] procedure in reviewing the tenure decision," but rather whether the applicant "was

afforded the process due to protect his property right to a fair tenure review process."  *Purisch*,

(4:13cv750)

76 F.3d at 1423-24 (affirming district court granting summary judgment to university on professor's section 1983 claim that the university's grievance process following the denial of his tenure application violated his procedural due process rights).

Ragozzine details Defendants' acts that, he alleges, did not afford him a fair tenure review process. He argues that the TDRC process was faulty and that "[its] role in affording Ragozzine due process reflects a material dispute of fact." ECF No. 55 at 35. He goes on to argue that the TDRC's finding was "only a recommendation which Anderson was not required to follow. . . . The TDRC's role is therefore a 'paper tiger'—a sham proceeding, with merely an empty pretense of any due process to Ragozzine." *Id*.

Ragozzine's does not explain or support with legal authority his apparent argument that the non-binding nature of the TDRC's recommendation rendered the review process unfair. Nor does he advance evidence to support his allegation that his appeal was a "sham proceeding." Rather, he complains that President Anderson decided not to follow the TDRC's non-binding recommendation. This is not evidence establishing a due process violation. *See Purisch*, 76 F.3d at 1424 (finding fault with the overall conclusion reached by a committee does not render the process unfair).

Similarly, Ragozzine's other allegations regarding President Anderson are not evidence of unfair process. Anderson's failure to "sign the review sheet," ECF No. 55 at 15, does not render the process unfair. His allegations that Anderson "did no independent investigation of Ragozzine's qualifications" is not compelling. During her deposition, Anderson stated under oath that she "reviewed in detail the tenure application, the student evaluations, the chairperson's

(4:13cv750)

evaluation, [and] the comments made by the dean." ECF No. 48 at 10-11.  She considered the

faculty vote and spoke to Dean Furnish, Chair Giorgetti, and Provost Kwawaja.  *Id*. at 22-23, 19.

She carefully reviewed Ragozzine's evaluations.  *Id*. at 20-21.  After she denied Ragozzine

tenure and he appealed, she considered the TDRC's recommendation.  *Id*. at 24.  Anderson asked

Theresa Riley, the assistant provost, to provide additional information to her about Ragozzine's

publications before she made her final decision.  *Id*. at 11-12; ECF Nos. 50 at 7 (Riley

deposition); 51-31 (Riley's report).  Accordingly, "the evidence in the record indicates that

conclusion was the result of an impartial and thorough inquiry that easily satisfied the

requirements of due process."  *Purisch*, 76 F.3d at 1424

Finally, Ragozzine's contention that "Giorgetti considered the recommendation of an

ineligible faculty member," Coldren, is also without merit.  ECF No. 55 at 14.  Ragozzine argues

that, per the CBA, Coldren was ineligible to vote on his tenure application because Coldren was

on sabbatical at the time of the vote.  *Id*.  Despite Coldren's ineligibility, Ragozzine points out

that Coldren attended the tenure meeting *via* Skype and was permitted to cast an unofficial vote.

*Id*.  Ragozzine alleges that Chair Giorgetti's recommendation, passed on to Dean Furnish, "did

not report the actual faculty vote [].  Rather, [Giorgetti] included Coldren's vote with the faculty

vote and characterized the results . . . as a 'majority' recommendation of the department."  *Id*. at

15.

Ragozzine's characterization of Giorgetti's recommendation is inaccurate.  Chair

Giorgetti's recommendation reads, in relevant part,

> Considering Dr. Ragozzine's performance in teaching, scholarship, and service,
> the official faculty vote did not reach a consensus.  Four faculty members

31

(4:13cv750)

> recommended tenure while four opposed a tenure decision.  Dr. Coldren viewed
> the personnel files prior to leaving campus on his sabbatical and utilized Skype to
> attend the tenure presentation.  He, however, was not permitted to officially vote
> due to the CBA which states that the supplementary materials in Human
> Resources need to be viewed.  Dr. Coldren, however, voted to oppose tenure.  (Dr.
> Coldren's vote is not in the official record, but is noted here to indicate the
> majority faculty decision.)

ECF No. 49-45 at 3.  Although Giorgetti ultimately characterized the faculty vote results as a

"majority faculty decision," she clearly stated that Coldren was not permitted to officially vote

and accurately reported that the official vote was split four-four.  *See also* ECF No. 46 at 14

(Dean Furnish deposition wherein he testified that he understood the faculty vote was 4-4).[13]

President Anderson testified that she did not consider Coldren's unofficial vote.  ECF No. 48 at

23.  The record, therefore, does not support Ragozzine's argument that permitting Coldren to

vote unofficially rendered the process unfair.  *See Purisch*, 76 F.3d at 1423 ("Purisch alleges a

number of way in which [defendants] failed to follow [university] guidelines in overseeing his

grievance.  Violation of a state's formal procedure, however, does not in and of itself implicate

constitutional due process concerns.").  Ragozzine has failed to show that he was not "afforded

the process due to protect his property right to a fair tenure review process."  *See id*.

## 2.  Substantive Due Process

Ragozzine relies on *Gutzwiller v. Fenik*, 860 F.2d 1317 (6th Cir. 1988) in support of his

---

[13]  Dean Furnish was asked,

Q:      Okay.  So the vote was four-four but you acted as though it was five-four?
A:      No, No.  I needed only to know that the department chair upheld those in the
        negative.  That was the key matter for me.
Q:      So the department chair, you adopted her vote?
A:      I supported her vote, yes.

ECF No. 46 at 14.

(4:13cv750)

argument that Defendants denied him substantive due process.  ECF No. 55 at 34.  The

*Gutzeiller* court set forth the substantive due process standard:

> Substantive due process . . . protects specific fundamental rights of individual
> freedom and liberty from deprivation at the hands of arbitrary and capricious
> government action.  The fundamental rights protected by substantive due process
> arise from the Constitution itself and have been defined as those rights which are
> implicit in the concept of ordered liberty.  While this is admittedly a somewhat
> vague definition, it is generally held that an interest in liberty or property must be
> impaired before the protections of substantive due process become available.
> Even if such an interest has been impaired by governmental action, courts will
> review the challenged decision only for arbitrariness or capriciousness.  Indeed, in
> the academic setting, as the Supreme Court made clear in *Ewing*, courts may
> override a decision under substantive due process only if that decision is such a
> substantial departure from accepted academic norms as to demonstrate that the
> person or committee responsible did not actually exercise professional judgment.

*Id*. at 1328 (internal citations and quotation marks omitted).

In *Gutzwiller*, the Sixth Circuit affirmed a jury verdict that the defendants intentionally

discriminated against the plaintiff based on her sex when they denied her tenure, thereby denying

her equal protection.  *Id*.  Because of that finding, the court determined that the jury could have

also found the defendants denied the plaintiff's substantive due process rights.  *Id*. at 1329.  The

court explained, "[c]ertainly, a decision to deny tenure on the basis of a candidate's sex is, as a

matter of law, such a substantial departure from accepted academic norms as to demonstrate that

Fenik and Cohen did not exercise professional judgment."  *Id*.

Unlike the plaintiff in *Gutzwiller*, Ragozzine's discrimination claim is without merit, as

explained above, and cannot, therefore, be the basis for finding that he suffered a substantive due

process violation.  Moreover, as noted, Ragozzine has not shown that the recommendation by

Giorgetti or the decision by Anderson to deny him tenure was "such a substantial departure from

33

(4:13cv750)

accepted academic norms as to demonstrate that the person or committee responsible did not

actually exercise professional judgment."  *See* id. at 1328.

      In sum, Ragozzine's due process claim is without merit and Giorgetti and Anderson are

entitled to summary judgment.  Moreover, because Ragozzine has failed to show he suffered a

violation of a constitutionally protected right, Giorgetti and Anderson are entitled to qualified

immunity.  *See Higgason v. Stephens*, 288 F.3d 868, 876 (6th Cir. 2002) (a plaintiff cannot

overcome the defense of qualified immunity when he fails to show a constitutional violation).

## IV.  Conclusion

      For the reasons explained above, the Court grants Defendants' Motion for Summary

Judgment in its entirety.  The case is dismissed.

      IT IS SO ORDERED.

  February 24, 2014                */s/ Benita Y. Pearson*
Date                            Benita Y. Pearson
                               United States District Judge